IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| JOAQUIN GONZALEZ, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:10-CV-164 (MTT) |
| | ) | |
| BUTTS COUNTY, GEORGIA, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

This matter is before the Court on the Defendants' Motion for Summary

Judgment.  (Doc. 44).  For the reasons set forth below, the Motion is **GRANTED**.

### I.    PROCEDURAL BACKGROUND

Plaintiff Joaquin Gonzalez filed this lawsuit April 22, 2010, alleging numerous

federal and state law causes of action.  He names as Defendants Butts County,

Georgia; Butts County Sheriff's Office; Officers Overbey, Hotchkiss, and Mundy ("Butts

County Defendants"), all in their individual capacities; Jenny Brenham; Megan Rice;

Chelsie Brenham; Guardian of B. Washington;[1] Bethany Washington; and Debra

Hunter.  On March 16, 2012, the Court dismissed Bethany Washington, Jenny

Brenham, Megan Rice, Chelsie Brenham, and Debra Hunter because the Plaintiff failed

to serve these Defendants in compliance with Fed. R. Civ. P. 4(m).  (Doc. 42).

---

[1] A default judgment has been entered against Defendant Guardian of B. Washington.
Pursuant to a separate order entered this same date, the default judgment has been set aside.
For the reasons discussed below in Section "E. State Law Claims," the Plaintiff's claims against
Defendant Guardian of B. Washington, which arise under Georgia law, are **dismissed without
prejudice**.

## II.   FACTUAL BACKGROUND[2]

This action arises out of the arrest of Plaintiff Joaquin Gonzalez, a former high school Spanish teacher at Jackson High School in Butts County, Georgia.  On December 17, 2008, Meghan Rice and Chelsie Brenham, two students at Jackson High School, accompanied their mother, Jenny Brenham, to the Butts County Sheriff's Office ("BCSO") to report information they had received about the Plaintiff.  (Doc. 44-2 at ¶ 6).  At the BCSO, these individuals each spoke with Investigator Christopher Hotchkiss.

During her conversation with Hotchkiss, Jenny Brenham told Hotchkiss, based on information she received from her daughters, that the Plaintiff sends text messages to certain students outside of school hours; that he invites students to social events not related to school gatherings, sometimes in exchange for passing grades; and, most disturbingly, that he forced the foreign exchange student living at his home to sleep in his bed when his wife was out of town.  (Investigative Summary; Doc. 44-3 at 5).  Meghan Rice told Hotchkiss that Bethany Washington, another student, told Rice that the foreign exchange student confided to Washington that she was forced to sleep in the Plaintiff's bed; that the Plaintiff and Washington's relationship was different than a normal student-teacher relationship; that the Plaintiff often sent text messages to Washington late at night, even after Washington had asked him to stop; and that he was persistent in trying to get Washington to attend social events with him outside of school.  (Investigative Summary; Doc. 44-3 at 7).  Rice also stated during her conversation with

---

[2] Pursuant to Federal Rule of Civil Procedure 56(e) and Local Rule 56, all material facts not controverted by specific citation to the record are deemed admitted, unless otherwise inappropriate.  Moreover, pursuant to Fed. R. Civ. P. 56(c)(3), the Court need only consider the cited materials, although it may consider other materials in the record.

Hotchkiss that she had caught the Plaintiff looking down her shirt and that he looks down the shirts of other students as well.  (Investigative Summary; Doc. 44-3 at 8).

During Chelsie Brenham's conversation with Hotchkiss, she stated that Debra Hunter, another student, told her the Plaintiff had been trying to get Hunter and Washington to "sleep over" since the arrival of the foreign exchange student; that she too had caught him looking down her shirt; and that Washington had told her that the Plaintiff forced the foreign exchange student to sleep in his bed when his wife was out of town.  (Investigative Summary; Doc. 44-3 at 9).

Later that day, on December 17, 2008, Bethany Washington came to the BCSO and spoke with Major Mike Overbey.  (Doc. 44-2 at ¶ 10).  Washington, who was 16 years old at the time, told Overbey that the Plaintiff sends her text messages asking why she is ignoring him and whether she is awake yet; that the text messaging had been going on for months; that the Plaintiff frequently rubs the arms, necks, and shoulders of certain students, including herself; and that he invites her over to have slumber parties with the foreign exchange student living at his house.  (Investigative Summary; Doc. 44-3 at 10).  According to Washington, the Plaintiff told her the slumber parties would involve him "getting drunk and swimming in the pool naked." (Investigative Summary; Doc. 44-3 at 10).  Washington said the Plaintiff also asked her if she thought it was possible for a teacher to be in love with more than one student. (Investigative Summary; Doc. 44-3 at 11).  Washington told Overbey that the Plaintiff invites her to social events unrelated to school and that, on one occasion, he asked her to skip school to go to Helen, Georgia, with him for the day.  (Investigative Summary; Doc. 44-3 at 11).  Washington stated that she was afraid the Plaintiff would fail her if

she did not do what he asked.  (Investigative Summary; Doc. 44-3 at 11).  In his report,

Overbey noted that Washington appeared scared of the Plaintiff, but that he detected no

deception, coaching, or embellishment indicators.  (Investigative Summary; Doc. 44-3 at

10).

     Based on this information, Hotchkiss sought warrants both for the Plaintiff's

arrest and for the search of his home.  In support of the search warrants, Hotchkiss

stated the following:

> The affiant is employed by the Butts County Sheriff's Office and is
> assigned to the Criminal Investigative Division Special Victims Unit.
> Joaquin Gonzalez did commit the offense Enticing a Child for Indecent
> Purposes when during the month of November 2008 he did invite a 16
> year old verbally and via text message to sleep overs and swimming
> parties.  Gonzalez did state that his nudity could be expected during the
> parties.  He openly discusses sexual encounters he hopes to have.  On
> December 17, 2008 three students of Gonzalez reported he had been
> making a female foreign exchange student between the ages of 16 and 17
> sleep with him in his bed.  All of the students confirmed Gonzalez has
> been text messaging two female students on a regular basis, asking them
> to sleep over and come over to his residence for pool parties during which
> he bragged he would be getting naked in front of them.

(Doc. 44-3 at 38).  The search warrants were signed and dated at 5:00 p.m. on

December 17, 2008, by Magistrate Judge Rebecca Pitts.[3]  (Doc. 44-3 at 37-38).

---

[3] In his statement of material facts, the Plaintiff claims Bethany Washington was not interviewed
until after he was arrested.  (Doc. 57-2 at ¶ 37).  He bases this statement on deposition
testimony from Angie Washington, Bethany Washington's mother.  However, for the information
regarding pool parties and the Plaintiff's alleged claim that he would swim naked (which only
appears in Washington's Investigative Summary) to have been included in the search warrant
affidavit, Washington would had to have spoken to Overbey before Hotchkiss applied for the
warrants, and therefore before BCSO officers arrived at the Plaintiff's home.  This version of
events was confirmed by Overbey, who stated in his deposition that the interview with
Washington occurred before the officers executed the warrants.  (Overbey Dep. at 101-02).
Elsewhere, Gonzalez appears to concede that the search and arrest occurred *after* Bethany
Washington was interviewed.  (Doc. 57 at 13).

In his application for the arrest warrant, Hotchkiss, the affiant, stated, to the best of his knowledge and belief, that the Plaintiff had committed the offense of "Enticing a Child for Indecent Purposes," in violation of O.C.G.A. § 16-6-5.  (Doc. 44-3 at 33). Specifically, Hotchkiss stated the following:

> A person commits the offense of enticing a child for indecent purposes when he or she solicits, entices, or takes any child *under the age of 16 years* to any place whatsoever for the purpose of child molestation or indecent acts.
>
> Joaquin Gonzalez did commit the offense of enticing a child for indecent purposes when he solicited a *16 year old juvenile* several times in person and by text messages to come to his home at 201 Butrill Road.  Gonzalez solicited her to his home to have a slumber party and sleep naked. Gonzalez also told the juvenile he wanted to go skinny dipping in his pool. This incident took place between Nov. 1 and Nov. 30, 2008.

(Doc. 44-3 at 33) (emphasis added).  The arrest warrant was signed and dated on December 17, 2008, by Magistrate Judge Rebecca Pitts.  (Doc. 44-3 at 33).  Hotchkiss does not recall whether he obtained the arrest warrant at the same time as the search warrant, but rather only that he obtained both warrants on December 17.  The parties agree that the "16 year old juvenile" referred to in the warrant affidavit is Bethany Washington.  (Doc. 44-3 at 3-4; Doc. 57-2 at ¶ 44; Hotchkiss Dep. at 98, 103-04).

To this point, the events giving rise to this action, other than the truth or falsity of the students' accusations, are largely undisputed.  However, events occurring after this time, starting at approximately 5:00 p.m. on December 17, are almost entirely in dispute.  According to the Plaintiff, he arrived home from school that day at approximately 4:30 p.m.  At 5:00 p.m., the Plaintiff claims he heard someone banging on his door.  The Plaintiff answered the door and was greeted by Defendant Overbey, who the Plaintiff claims was alone.  (Doc. 57-2 at ¶ 21).  Overbey had a folded up piece

of paper in his hand and asked to speak with the Plaintiff.  The Plaintiff agreed, and the two stepped outside.  According to the Plaintiff, Overbey then told him he had a warrant for his arrest and placed him in handcuffs, the tightness of which the Plaintiff says he complained at least twice.  (Doc. 57-2 at ¶¶ 23, 25).  The Plaintiff also claims Overbey began swearing at him and told him that he had notified several local television stations.[4]  Shortly thereafter, several other BCSO officers arrived and began to search the Plaintiff's home.  After approximately 25 minutes, the search concluded, and the Plaintiff was transferred in handcuffs back to the BCSO.  (Doc. 57-2 at ¶ 25).  Before getting into the transport vehicle, the Plaintiff recalls, the handcuffs were loosened. (Plaintiff Dep. at 137).

Hotchkiss and Overbey's accounts are slightly different.  According to Hotchkiss, he and Overbey arrived at the Plaintiff's home at the same time to execute the search warrant.  (Hotchkiss Dep. at 51).  After entering the home, the Plaintiff was placed under arrest and handcuffed.  Overbey denies responsibility for placing the Plaintiff under arrest.  (Overbey Dep. at 106).  Officer Ken Mundy remembers, upon entering the home, that other officers were already in the house and that the Plaintiff had already been handcuffed.  (Mundy Dep. at 65).  Hotchkiss claims the Plaintiff was shown a copy of the search warrant at this time and that, if the arrest warrant was "in hand," it too would have been shown to the Plaintiff.[5]  (Hotchkiss Dep. at 106).  The officers then

---

[4] Apparently there were television crews at the Plaintiff's home at the time of the search. Curiously, no one recalls how the TV crews were alerted to the events.

[5] Overbey claims that "that document was in hand when [they] left" to go to Gonzalez's house. (Overbey Dep. at 101).  It is not clear whether he is referring to the search warrant or the arrest warrant.

conducted the search.  After the search was complete, the Plaintiff was transported back to the BCSO.

After the Plaintiff was arrested and placed in a holding cell at the BCSO, Hotchkiss, who was the lead investigator, continued his investigation.  On the evening of December 17, Hotchkiss questioned the Plaintiff about the students' allegations.[6] The Plaintiff, for the most part, denied the allegations.  (Investigative Summary; Doc. 44-3 at 13-14).  He admitted that he sent text messages to several of the female students and that he often invited Washington and other students to go to dinner with him and the foreign exchange student.  However, he denied that the text messages included any inappropriate content or that he invited any students over for pool parties at which he would swim naked.  (Investigative Summary; Doc. 44-3 at 13-14).  The Plaintiff ardently denied forcing the foreign exchange student to sleep in the bed with him, and then requested an attorney.  (Investigative Summary; Doc. 44-3 at 13-14). Following his questioning, at approximately 8:26 p.m, the Plaintiff was booked into the jail at the BCSO.  (Doc. 44-3 at 26).

That same night, Hotchkiss interviewed the exchange student living with the Plaintiff.  The student denied ever having slept in the same bed with the Plaintiff.  She said she never told Washington she was forced to sleep with the Plaintiff, and she did not know why Washington would make up such a story.  (Investigative Summary; Doc. 44-3 at 15).

---

[6] This interview was recorded.

On December 18, 2008, the day after the Plaintiff's arrest, Hotchkiss interviewed Debra Hunter, another of the Plaintiff's students.  Among other things, "Hunter recalled a day when she was in Gonzalez's class and she had just broken up with her boyfriend. Hunter went on to say Gonzalez massaged her back and said he (Gonzalez) had invited her (Hunter) over to his house many times.  Hunter said Gonzalez went on to say she (Hunter) should come over and hang out so he (Gonzalez) could show her what a real man was all about."  (Investigative Summary; Doc. 44-3 at 18).  Hunter also stated that the Plaintiff invited her and Washington over for sleep overs and that he would "make comments about how when he drinks a little he likes to go skinny dipping and she (Hunter) and Washington should come over for that."  (Investigative Summary; Doc. 44-3 at 19).  "Hunter said Washington told her she had changed clothes at Gonzalez's house and she (Washington) saw cameras in [the foreign exchange student's] room where she changed and she (Washington) knows Gonzalez has seen her naked. Hunter said when Gonzalez made the comment about her (Hunter) coming over to his (Gonzalez) house so he could show her what a real man was about she (Hunter) took it as Gonzalez making a sexual advance towards her."  (Investigative Summary; Doc. 44-3 at 20).  Several other students were also interviewed on December 18, 2008.  With little exception, nothing in those interviews was particularly incriminating or exonerating.

Following Hunter's testimony on December 18, Hotchkiss secured a second search warrant for the Plaintiff's home.  (Doc. 44-3 at 34).  This search warrant authorized a search for video recording devices.  (Doc. 44-3 at 34).  According to Hotchkiss, no video recording equipment was found but investigators did find "cables that looked like they belonged to recording devices."  (Hotchkiss Dep. at 138).  These

cables were not removed, however, because they were embedded in the walls. (Hotchkiss Dep. at 138).  Four days later, on December 22, Hotchkiss applied for three additional arrest warrants.  (Doc. 44-3 at 30-32).  The warrants charged the Plaintiff with one count of Contributing to the Delinquency of a Minor and two counts of Criminal Attempt of Sexual Assault.  (Doc. 44-3 at 30-32).

The Contributing to the Delinquency of a Minor charge was based on the Plaintiff's alleged invitation to a student to skip school for a trip to Helen, Georgia.  (Doc. 44-3 at 30).  The attempt charges were based on the Plaintiff allegedly massaging Debra Hunter's shoulders and telling her that he could show her what a real man was like and his alleged invitation to Bethany Washington for sleep overs and pool parties, at which it could be expected there would be naked swimming.  (Doc. 44-3 at 31-32). Regarding the attempt charge involving the Plaintiff's alleged conduct with Bethany Washington, the application for the arrest warrant stated as follows:

> A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime.  A person commits sexual assault when such person has supervisory or disciplinary authority over another person and such person engages in sexual contact with that other person
>
> Joaquin Alberto Gonzalez did commit the offense of criminal attempt sexual assault when he invited Bethany Joy Washington over to his house for sleep overs and pool parties.  During the invitations to the pool parties Gonzalez stated when he drinks he likes to get naked and skinny dip.  During the invitations to sleep over Gonzalez stated he sleeps in the nude.  Washington stated she took this as a solicitation for sexual contact.

(Doc. 44-3 at 31).

The Plaintiff does not recall how many days he spent in jail,[7] only that he was still in custody on his wedding anniversary on December 22, 2008.  (Gonzalez Dep. at 135). The case against the Plaintiff was eventually presented to a Butts County Grand Jury in July 2009.  The Grand Jury returned a "No Bill" on July 14, 2009, and the Plaintiff was never brought to trial on any of the charges against him.

### III.   DISCUSSION

#### A.   Summary Judgment Standard

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material facts and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Info. Sys. & Networks Corp*, 281 F.3d at 1224.  The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor."  *Id.*

#### B.   Defendant Butts County

The Plaintiff apparently seeks to hold Butts County liable pursuant to 42 U.S.C. § 1983 for the actions of Defendants Overbey, Hotchkiss, and Mundy.  He also claims

---

[7] "It could have been seven days.  It could have been four days.  It could have been five days." (Gonzalez Dep. at 135).

Butts County is liable for the negligent hiring, retention, training and supervision of these three individuals.

Generally, the Eleventh Circuit has "rejected the notion that a Georgia county can be liable under § 1983 for the actions of members of a sheriff's office, finding that, pursuant to the Georgia Constitution, a sheriff's office is independent from the county in which it operates."  *Townsend v. Coffee Cnty., Ga.*, __ F. Supp. 2d __, 2011 WL 7693033 at *2 (S.D. Ga.) (citing *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1332, 1335 (11th Cir. 2003)).  Because sheriffs and their deputies are considered actors of the state, as opposed to the county, "counties have no authority or control over, and no role in, Georgia sheriffs' law enforcement function."  *Grech*, 335 F.3d at 1336.  "Georgia courts also speak with unanimity in concluding that a defendant county cannot be held liable for the tortious actions of the sheriff or his deputies in performing their law enforcement activities."  *Id.* at 1337 (citing *Wayne Cnty. Bd. of Comm'rs v. Warren*, 236 Ga. 150, 223 S.E.2d 133, 134 (1976)).

In light of the strict limitations on municipal liability under section 1983, a county will be held responsible only when the county's "official policy" causes a constitutional violation.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  A plaintiff can establish an official policy of the county by showing either (1) an officially promulgated policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county.  *Id.*  at 690-91.  Thus, to succeed on this claim, the Plaintiff must show any alleged constitutional violations were the result of some custom or policy over which Butts County had some degree of control or responsibility.

-11-

The Plaintiff claims Butts County has a policy of requiring officers to obtain approval from the Sheriff and the Butts County district attorney before filing criminal charges. He also claims that Butts County negligently hired, retained, trained and supervised Overbey, Hotchkiss, and Mundy. In short, he claims Butts County is liable for his allegedly unlawful arrest. As noted above, however, counties in Georgia "have no role in the training or supervision of the sheriff's deputies. Instead, sheriffs exercise authority over their deputies independent from the county. Sheriffs alone hire and fire their deputies." *Grech*, 335 F.3d at 1336. At all relevant times, Defendants Overbey, Hotchkiss, and Mundy were acting on behalf of the State, not the County. Although Gonzales cites a "policy" he claims caused his constitutional injury, the Plaintiff has produced no evidence that Butts County had any involvement – either through an official county policy or through the repeated acts of a final policymaker for the county – in his arrest and the events occurring subsequent thereto. He has likewise failed to show that Butts County wielded any authority or responsibility over BCSO law-enforcement activities or the hiring, retention, training, or supervision of Defendants Overbey, Hotchkiss, and Mundy. Consequently, Butts County cannot be held liable for the actions of Overbey, Hotchkiss, and Mundy, and on the Plaintiff's federal law claims, Defendant Butts County is entitled to summary judgment.

To the extent the Plaintiff has asserted any claims against Defendant Butts County based on state law, those claims are barred by sovereign immunity. The sovereign immunity enjoyed by the State of Georgia is also enjoyed by Georgia counties. *Toombs Cnty. v. O'Neal*, 254 Ga. 390, 330 S.E.2d 95 (1985). "Sovereign immunity is not an affirmative defense … that must be established by the party seeking

its protection.  Instead, immunity from suit is a privilege that is subject to waiver by the State, and the waiver must be established by the party seeking to benefit from the waiver."  *Forsyth Cnty. v. Greer, et al.*, 211 Ga. App. 444, 439 S.E.2d  679, 681 (1993).  The Plaintiff makes no argument that Butts County's sovereign immunity has been waived nor is the Court aware of any waiver provision applicable to the facts of this case.  Accordingly, Defendant Butts County is entitled to summary judgment on all state law claims.

### C.     Defendant Butts County Sheriff's Office

The Plaintiff has also named BCSO as a Defendant, although it is not clear exactly what specific claims he asserts against it.  The Defendants argue the BCSO is entitled to summary judgment because the BCSO is not a legal entity capable of being sued.  In response, the Plaintiff appears to agree, although that too is unclear.  Under the heading "II. Butts County Sheriff's Office," the Plaintiff states: "Mr. Gonzalez agrees that Butts County would be entitled to summary judgment in light of the fact that the Sheriffs [sic] office would be liable because Sheriff Pope is being sued in his official capacity."  (Doc. 57 at 12).  The Court's uncertainties are these:  first, under the heading "Butts County Sheriffs Office," the Plaintiff refers only to "Butts County;" and second, Sheriff Pope, either in his individual or official capacity, has not been sued as part of this action.  Despite any confusion, the issue is easily resolved.

The issue of whether a government entity is capable of being sued is "determined by the law of the state in which the district court is held."  Fed. R. Civ. P. 17(b); *accord Lawal v. Fowler*, 196 Fed. Appx. 765, 768 (11th Cir. 2006).  Under

-13-

Georgia law, only three classes of legal entities are capable of being named in a lawsuit: (1) natural persons; (2) artificial persons (a corporation); and (3) quasi-artificial persons as the law recognizes as being capable to sue." *Lawal*, 196 Fed. Appx. at 768 (citing *Ga. Insurers Insolvency Pool v. Elbert Cnty.*, 258 Ga. 317, 368, 368 S.E.2d 500 (1988)).  A sheriff's office does not fall into any of the categories and therefore is not capable of being sued.  *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992); *Ashley v. Chafin*, 2009 WL 3074732 (M.D. Ga.).  Accordingly, Butts County Sheriff's Office is entitled to summary judgment.

### D.    Federal Law Claims

#### i.    False Arrest, Unreasonable Search, and Malicious Prosecution

Before addressing the substance of the Plaintiff's claims, it is necessary to determine exactly what claims the Plaintiff is trying to assert.

The Plaintiff has included a laundry list of claims in his complaint.  (Doc. 1). Chief among them, and the real crux of the Plaintiff's complaint, are his claims of false arrest, unreasonable search, and malicious prosecution against Defendants Overbey, Hotchkiss, and Mundy pursuant to 42 U.S.C. § 1983.  Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 itself does not create any protected rights, but instead provides a remedy for constitutional violations committed under color of state law.  The

relevant inquiry under § 1983 then is whether a right secured by the Constitution has been violated.

Here, the Plaintiff's § 1983 claims involve clearly established rights arising under the Fourth Amendment.  Regarding false arrest, "there is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment."  *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997).  Similarly, a search warrant supported by an affidavit that "contains 'deliberate falsity or ... reckless disregard' for the truth" may lack probable cause and be found void under the Fourth Amendment.  *Id.* at 1326-27 (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).  The Eleventh Circuit also "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under section 1983."  *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010).  "To prove a section 1983 malicious prosecution claim, under federal and Georgia law, a plaintiff must show the following:  (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused."  *Kjellsen v. Mills*, 517 F.3d 1232, 1237 (11th Cir. 2008).  Furthermore, an officer may be liable under § 1983 if he includes recklessly false statements in support of a warrant or seeks a warrant where "a reasonably well-trained officer … would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant."  *Malley v. Briggs*, 475 U.S. 335, 345 (1986).[8]

---

[8] There is some confusion as to whether the Plaintiff's arrest on December 17, 2008, was pursuant to an arrest warrant.  On one hand, there is no doubt that the initial arrest warrant was

Even if a constitutional violation has occurred, however, a defendant may still be protected by qualified immunity. "Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotations and citation omitted).

A threshold determination in qualified immunity analysis is whether the official was acting within the scope of his discretionary authority when the alleged constitutional violation occurred. *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009).[9]  Once discretionary authority is established, the burden shifts to the plaintiff to demonstrate (1) that there was a violation of a constitutional right and (2) that the constitutional right was

_____

obtained on December 17, 2008. (Doc. 44-3 at 33). The Plaintiff also claims that when he was placed under arrest, Overbey held a folded piece of paper and told the Plaintiff he had a warrant for his arrest. On the other hand, however, neither Hotchkiss nor Mundy recall whether the arrest warrant had been secured at the time of the Plaintiff's initial arrest. (Hotchkiss Dep. at 50; Mundy Dep. at 66). The Plaintiff disputes that an arrest warrant had been issued at that time, and in his complaint, claims that his arrest was "warrantless." (Gonzalez Dep. at 154; Doc. 1 at ¶ 45; Doc. 57-2 at ¶ 42: "Gonzalez disputes that the arrest took place when officers arrived with an arrest warrant"). Construed in the light most favorable to the Plaintiff, the Plaintiff's arrest was not pursuant to a warrant, and the Court will analyze his claims accordingly. The Defendants therefore will not benefit from, and the Court will not entertain, argument that the chain of causation was broken by the magistrate judge's finding of probable cause.

[9] Here, neither party disputes that Defendants Overbey, Hotchkiss, and Mundy were acting within their discretionary authority. *Pair v. City of Parker Fla. Police Dep't*, 383 Fed. Appx. 835, 839 (11th Cir. 2010) (finding police officer acted within scope of discretionary authority in obtaining arrest warrant and making arrest).

clearly established at the time of the violation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  This two-step analysis may be done in whatever order is deemed most appropriate for the case.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Plaintiff's false arrest, unreasonable search, and malicious prosecution claims all hinge on probable cause,[10] as the absence of probable cause is an element of each.  As a result, the traditional two-step qualified immunity analysis is somewhat different.  In the Eleventh Circuit, a section 1983 plaintiff must do more than establish the absence of probable cause; he must establish the absence of "arguable probable cause."  Arguable probable cause requires only that "under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present."  *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004).  "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that probable cause exists."  *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007).  What is relevant for qualified immunity purposes is "the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later."  *Jones v. Cannon*, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999).  Moreover, "[w]here there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause."  *U.S. v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992).

---

[10]Probable cause exists "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown that the suspect has committed, is committing, or is about to commit an offense."  *Rankins v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998).

There is some confusion with regard to where the arguable probable cause determination fits in qualified immunity analysis.  Some courts make the arguable probable cause determination as a part of the constitutional violation prong.  *Skop,* 485 F.3d at 1137-43.  Other courts insist that the determination of arguable probable cause is a part of the clearly established law prong.  *Poulakis v. Rogers*, 341 Fed. Appx. 523, 526-28 (11th Cir. 2009).  Most courts, however, do not bother to say where the arguable probable cause determination goes.  *Coffin v. Brandau*, 642 F.3d 999, 1006-07 (11th Cir. 2011) (*en banc*).

There is some logic to the last approach because, at least in the Eleventh Circuit, the arguable probable cause determination, as a practical matter, subsumes the entire qualified immunity analysis.  If there is no arguable probable cause, the plaintiff necessarily will have carried the burden of proving constitutional injury.  To the extent the determination of arguable probable cause is based on relevant law demonstrating "whether an officer reasonably could have believed that probable cause existed," that determination will reveal whether the law was sufficiently established to provide "fair warning" to the officer that his or her conduct was unlawful.  In short, the arguable probable cause determination effectively reduces qualified immunity to a one-step analysis.[11]

However, the Eleventh Circuit's decision in *Poulakis* illustrates a possible reason why it could make a difference where the arguable probable cause determination is placed.  In *Poulakis*, the plaintiff complained that officers violated his Fourth

___

[11] At least this appears to be the case in the Eleventh Circuit.  In *Walczyk v. Rio*, 496 F.3d 139, 165-71 (2d Cir. 2007), Justice, then Judge, Sotomayor argued in a concurring opinion that the Second Circuit's articulation of the arguable probable cause test adds a third layer to the qualified immunity analysis.

-18-

Amendment rights when they arrested him for carrying an unlawfully concealed firearm.

Poulakis had stored his firearm in the closed center console of his automobile.  Unsure

whether the firearm had been concealed in violation of Florida law, officers telephoned

an Assistant State Attorney who, after hearing the facts, opined that the officers had

probable cause to make an arrest.  As it turned out, however, Florida's concealed

firearm statute excludes a firearm "securely encased" in a private vehicle.  Fla. Stat.

§ 790.25(5).  Consequently, the criminal charges were dropped.

Poulakis then filed a section 1983 civil rights action against the officers.  When

the defendants moved for summary judgment based on qualified immunity, the

dispositive issue was whether the officers had arguable probable cause to arrest

Poulakis.  The panel majority made clear that the resolution of this question was a part

of the clearly established law prong.  As the Court put it, "[i]n wrongful arrest cases, we

have frequently framed the 'clearly established' prong as an 'arguable probable cause'

inquiry.  In other words, we have said that when an officer violates the Constitution

because he lacked [actual] probable cause to make an arrest, the officer's conduct may

still be insulated under the second prong of qualified immunity *if* he had 'arguable

probable cause' to make the arrest."  *Poulakis*, 341 Fed. Appx. at 526 (emphasis in

original).  Finding no Supreme Court, Eleventh Circuit, or Florida Supreme Court

authority clearly establishing that a firearm in a console constituted a securely encased

weapon, the majority held that the officers had arguable probable cause to arrest

Poulakis.

The dissent took issue "with the majority's analysis [because] it treats arguable

probable cause as part of the clearly established prong of the qualified immunity

analysis, when both Eleventh Circuit precedent and reason show that whether a federal constitutional right was clearly established is distinct from whether a police officer was objectively reasonable in making an arrest." *Id.* at 534 (Quist, J., sitting by designation, dissenting).  To the dissent, the peculiar facts of the case made this a critical issue.  The dissent agreed that for purposes of resolving the clearly established law prong of qualified immunity analysis, the relevant authority was decisions of the Supreme Court, the Eleventh Circuit, and the Florida Supreme Court, and no decision of those courts had addressed the issue of whether a pistol in a console was securely encased pursuant to Florida's concealed weapon statute.  However, there was, the dissent noted, ample lower and intermediate court authority in Florida establishing that a firearm in a console was securely encased.  For purposes of the constitutional violation prong, a court can, the dissent continued, look to all applicable authority, not just the authority relevant to determine whether a right has been clearly established.

Thus, in this very narrow context, perhaps it could make a difference where the arguable probable cause determination fits in the qualified immunity analysis.  Here, however, as discussed below, whether the Defendants had arguable probable cause to apply for a warrant or to arrest the Plaintiff determines the fate of the motion regardless of where that determination fits.  In making that determination, the Court must look to the elements of the alleged crime and the facts and circumstances within the collective knowledge of the officers at the time of the arrest.  *Grider*, 618 F.3d at 1257.

The Plaintiff was initially arrested for the crime of Enticing a Child for Indecent Purposes, in violation of O.C.G.A. § 16-6-5.  "A person commits the offense of enticing a child for indecent purposes when he or she solicits, entices, or takes any child under

the age of 16 years to any place whatsoever for the purpose of child molestation or indecent acts." O.C.G.A. § 16-6-5. It is not necessary for any indecent act to have been accomplished or even attempted, merely that it was the motivation for the enticement. *Morris v. State*, 179 Ga. App. 228, 228, 345 S.E.2d 686, 687 (1986). Four days later, on December 22, the Plaintiff was charged with, among other crimes, Criminal Attempt of Sexual Assault in violation of O.C.G.A. §§ 16-4-1 and 16-6-5.1. (Doc. 58-18). "A person who has supervisory or disciplinary authority over another individual commits sexual assault when that person is a teacher … and engages in sexual contact with such other individual who the actor knew or should have known is enrolled at the same school." O.C.G.A. § 16-6-5.1(b)(1). "Sexual contact means any contact between the actor and a person not married to the actor involving intimate parts of either person for the purpose of sexual gratification of the actor." O.C.G.A. § 16-6-5.1(a)(4). Criminal attempt requires the actor to "perform[] any act which constitutes a substantial step toward the commission of that crime" while possessing intent to commit the specific offense. O.C.G.A. § 16-4-1.

At the time of the Plaintiff's arrest, the information within the collective knowledge of the arresting officers was: Chelsie Brenham, one of the Plaintiff's students, told Hotchkiss that the Plaintiff had on numerous occasions invited Bethany Washington and Debra Hunter to sleep over at his house; that she had caught the Plaintiff looking down her shirt; and that she had been told by Bethany Washington that the Plaintiff forced the foreign exchange student living at his home to sleep in his bed when his wife was out of town. Megan Rice, another of the Plaintiff's students, also told Hotchkiss she had heard from Washington that the Plaintiff forced the foreign exchange student to sleep in his

bed; that the Plaintiff sent text messages to Washington late into the night, even after Washington had asked him to stop; and that she too had caught the Plaintiff looking down her shirt and those of other female students.  As noted, some of the information Brenham and Rice relayed to Hotchkiss was based on what they had been told by Hunter and Washington.  Hotchkiss also interviewed Jenny Brenham, Megan and Chelsie's mother.  Jenny Brenham essentially confirmed that her daughters told her what they eventually told Hotchkiss.

The Brenhams' allegations led to further investigation, and, that afternoon, Overbey interviewed Bethany Washington.  (Doc. 44-2 at ¶ 10; Doc. 57-1 at ¶ 10).  She said that the Plaintiff often sends her text messages; that he frequently rubs the arms, neck, and shoulders of certain students, including herself, while at school; that the Plaintiff "constantly" invites her over to his house to have a slumber party with the foreign exchange student; and that his slumber parties involve him getting drunk and swimming naked in the pool.  (Investigative Summary Doc. 44-3 at 10).  Washington also told Overbey that the Plaintiff asked her if she thought it was possible for a teacher to be in love with more than one student.  (Investigative Summary; Doc. 44-3 at 11).  In his report, Overbey noted that Washington appeared scared of the Plaintiff, but that he detected no deception, coaching, or embellishment indicators.  (Investigative Summary; Doc. 44-3 at 10).

The question is whether this collective information provided the BCSO with arguable probable cause to arrest the Plaintiff on December 17.  Crucially, it is not necessary that the facts providing probable cause match the specific offense for which officers actually arrested the Plaintiff.  "[A]n arresting officer's state of mind (except for

the facts that he knows) is irrelevant to the existence of probable cause.  That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.  As we have repeatedly explained, the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (internal quotations omitted) (internal citations omitted).  Thus, an officer "is shielded by qualified immunity so long as [he] had probable cause to arrest [the Plaintiff] for *any* offense."  *Durruthy v. Pastor*, 351 F.3d 1080, 1090 n.6 (11th Cir. 2003).

The facts as they would objectively appear to a reasonable law enforcement officer are particularly important to the disposition of this case because there is some question as to whether it was even possible for the Plaintiff to commit the crime for which he was first arrested, Enticing a Child for Indecent Purposes.  That offense can be committed only against a child "*under* the age of 16 years."  O.C.G.A. 16-6-5(a) (emphasis added).  In this case, Bethany Washington was 16 years old at the time of the events underlying the Plaintiff's arrest.  (Doc. 44-3 at 2; Doc. 44-3 at 3-4; Bethany Washington Dep. at 70)

However, whether Bethany Washington's age negates the legality of the Plaintiff's December 17 arrest need not be decided if, on that date, the facts provide arguable probable cause to arrest him for some other crime.  They did.  Specifically, prior to the Plaintiff's December 17 arrest, Bethany Washington had alleged the Plaintiff often sends her text messages; that he frequently rubs her arms, neck, and shoulders at

school; that he "constantly" invites her to his house for a slumber party with the foreign exchange student; and that he told her his slumber parties involve him getting drunk and swimming naked in the pool.  (Investigative Summary Doc. 44-3 at 10).

From this, a reasonable law enforcement officer could infer that the Plaintiff was trying to solicit contact "involving intimate parts of either" himself or Bethany Washington "for the purpose of [his] sexual gratification."  *See* O.C.G.A. § 16-6-5.1(a)(4).  Giving neck, arm, and shoulder rubs to a student at his school, coupled with his invitation to an alcohol and nudity-laced slumber party, could be interpreted by a law enforcement officer as a substantial step toward achieving sexual contact with that student.  So even if it was legally impossible to arrest the Plaintiff for Enticing a Child, these facts are sufficient to provide arguable probable cause to charge the Plaintiff with attempted sexual assault, as the BCSO did on December 22.  That this charge could have been brought on December 17 is borne out by the text of the December 22 warrant affidavit, which relies on essentially the same facts as the December 17 warrant affidavit. Therefore, if arguable probable cause existed, it existed at least for attempted sexual assault.

Because it ultimately is immaterial whether the BCSO announced the correct charge when it first arrested the Plaintiff, the remaining issues concern whether it conducted a sufficiently thorough investigation prior to arresting the Plaintiff.  In his Response to the Defendants' Motion for Summary Judgment, the Plaintiff takes issue with the fact that the Defendants (1) did not verify the existence of the alleged text messages prior to his arrest; (2) acted on hearsay; and (3) gave "false testimony to a Magistrate without having attempted to verify same."  (Doc. 57 at 14).  The Plaintiff

asserts that "[e]very reasonable officer in the Defendants' position would have known that probable cause did not exits [sic] to arrest Mr. Gonzalez."[12]  (Doc. 57 at 22). Although this argument is couched in probable cause language, the Plaintiff makes no attempt to explain – either through citation to factually similar precedent or otherwise – how the standard applies here.[13]

One potentially comparable case the Plaintiff did not cite is *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004).  There, the Eleventh Circuit reversed the district court's holding that the defendants were entitled to qualified immunity, finding that "a jury question exists as to whether the defendants constructed evidence upon which to base Kingsland's arrest." *Kingsland*, 382 F.3d at 1233.  In *Kingsland*, the plaintiff was arrested for driving under the influence of marijuana following a vehicle collision with a police officer.  *Id.* at 1225.  This arrest was made after officers claimed to smell a slight odor of marijuana coming from Kingsland and her vehicle, despite the fact that

> (1) …the officers chose not to conduct a search of Kingsland's vehicle, her person, or her passengers to corroborate their testimony; (2) the officers did not call in drug-sniffing dogs to confirm their suspicions of drug use; (3) no drugs were ever found or produced; (4) Kingsland tested negative for cannabis; (5) Kingsland's vehicle was not impounded as evidence, nor was her allegedly odoriferous clothing retained; (6) the defendants stated in their arrest affidavit that Kingsland ran the red light, allegedly without

---

[12] The Plaintiff's Response consists almost entirely of boilerplate recitations of the requirements for granting qualified immunity, with very little analysis of why qualified immunity is not applicable in this case.

[13] The Plaintiff correctly states numerous times that a judicial precedent with materially identical facts is not essential for the law to be clearly established.  When that is the case, however, and a plaintiff instead relies upon a general constitutional rule, the plaintiff must establish that the rule applies "with obvious clarity to the specific conduct in question."  *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002).  The Plaintiff has not established that any general constitutional rule applies with obvious clarity to the facts of this case.

taking statements from available witnesses or from Kingsland herself; and
(7) the officers decided to charge Kingsland with DUI-cannabis rather than
DUI-alcohol, and simultaneously destroy an initial arrest affidavit, only
after she passed Breathalyzer tests.

*Id.* at 1226-27.  In short, the investigating officers intentionally ignored and/or fabricated

evidence that was material to the question of probable cause.  There also was evidence

that the officers were motivated by a desire to help a fellow officer who was involved in

an accident with the plaintiff.  *Id.* at 1228 n.9.  The Eleventh Circuit ultimately concluded

that the investigation was deficient because the officers proceeded in a biased fashion,

and "consciously and deliberately" chose not to try and "uncover reasonably

discoverable, material information."  *Id.* at 1229-30.

    The current circumstances are distinguishable and do not rise to the level of

culpability that the *Kingsland* defendants displayed.  The Defendants received factually

consistent complaints from two students (who were interviewed separately) that the

Plaintiff often looked down female students' shirts and that Bethany Washington told

them the Plaintiff forced the foreign exchange student living with him to sleep in his bed.

Based on these allegations, Defendants took the additional step of summoning Bethany

Washington to the BCSO, where she related her interactions with the Plaintiff.  Included

in her firsthand account was the alleged invitation to slumber parties at which it could be

expected the Plaintiff would swim naked.  Notably, the Defendants did not seek the

Plaintiff's arrest until after speaking with Bethany Washington.  Had the BCSO relied

solely on the third-hand accounts of Meghan Rice and Chelsie Brenham, perhaps this

would be a different case.  But that is not what happened here.  The Defendants got

corroborating information directly from the alleged "victim" before taking action against the Plaintiff.

Although the Plaintiff obviously contends the girls' allegations against him are false, he cites no evidence giving rise to even an inference that Overbey, Hotchkiss, or Mundy had reason to believe that to be the case.[14]   The record simply does not suggest that, prior to arresting the Plaintiff, the officers were presented with any evidence refuting the girls' allegations.  The student-witnesses' and victim's complaints were in no way contradictory, and as noted in his investigative summary, Overbey detected no signs of deception, coaching, or embellishment during his interview of Bethany Washington.[15]  (Doc. 44-3 at 10).

Unlike *Kingsland*, the Defendants in this case did not make deliberately false statements or fabricate evidence to bolster the case against the Plaintiff, nor is there evidence of any motive to manufacture probable cause.  And while text evidence could have perhaps provided additional support for at least some of the allegations, the absence of such evidence is not proof of their falsity.

Finally, as to the Plaintiff's claim that the Defendants improperly "acted on hearsay," the Court disagrees.  Although some of the information obtained from the interviews of the complainants included accounts of what they heard from classmates, in the context of this action, that information is not offered to prove the truth of those

---

[14] In fact, there is no evidence in the record that the allegations were false, other than the Plaintiff's denials.  Although the foreign exchange student denied ever sleeping in the same bed with the Plaintiff, the Plaintiff's arrest was based on the allegations that he invited Bethany Washington to his house for a pool party at which he would swim naked.  (Doc. 57-2 at ¶ 44).

[15] Overbey did state in his deposition that teenagers are more likely than children under ten to fabricate accusations.  Other than this generality, however, the Plaintiff gives no reasons for the Defendants to have doubted the credibility of the accusers.

accusations.  Rather, it is offered to show what the Defendants knew or believed to be true at the time of the Plaintiff's arrest.  Thus, they are not hearsay.[16]  *Trujillo v. Fla. Agency for Health Care Admin.*, 405 Fed. Appx. 461, 464 (11th Cir. 2010).[17]

The Court recognizes that the Defendants did not "investigate every theoretically plausible claim of innocence" prior to arresting the Plaintiff.  *Kingsland*, 382 F.3d at 1229.  However, the Court also recognizes that the Defendants did not have to. Although this was not an air-tight investigation, and although more might have been done to test the girls' claims prior to arresting the Plaintiff, the investigation was not "plainly incompetent."  *Rushing v. Parker*, 599 F.3d 1263, 1268 (11th Cir. 2010) (quoting *Kingsland*, 382 F.3d at 1231).  An exhaustive and resource-intensive investigation is not required in every situation, and there is no shortage of cases in which probable cause was found despite less-than-perfect criminal investigations.  *See Moreshead v. Ott*, 2009 WL 5083425 at *7 (S.D. Fla.) (citing cases).  For example, in *Lowe v. Aldridge*, 958 F.2d 1565, 1571 (11th Cir. 1992),  the Defendant officers acted on sufficient probable cause to claim qualified immunity when they relied on uncorroborated evidence of a child sex abuse victim when requesting warrants.  Similarly, a defendant police officer had arguable probable cause to arrest the plaintiff for making terroristic threats even though there was no evidence to corroborate the victim's claim that the plaintiff had threatened him.  *Williams v. Taylor-Lee*, 397 Fed. Appx. 608, 610 (11th Cir. 2010).

---

[16] In any event, hearsay, alone, is not grounds for finding a lack of probable cause.  Indeed, "[h]earsay may, and frequently does, establish probable cause," even though  it may not be admissible at trial as proof of guilt.  *Favre v. Henderson*, 464 F.2d 359, 367 n.17 (5th Cir. 1972).

[17] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

As the Supreme Court has stated, "the Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145 (1979).  Moreover, police are entitled to make mistakes, and to the extent the Defendants' performance was less than ideal, the "conduct here is the type that qualified immunity is meant to protect: 'a reasonable mistake in the legitimate performance of [an officer's] duties.' " *Rushing*, 599 F.3d at 1267 (quoting *Kingsland*, 382 F.3d at 1233).  Absent evidence that the Defendants purposely and knowingly ignored exculpatory evidence, constructed false evidence, or acted in reckless disregard of the truth of the allegations against the Plaintiff, the Court is unable to conclude that the Defendants' behavior was constitutionally deficient.

Finally, the Plaintiff in the broadest terms alleges in his complaint that he was the victim of a "warrantless and unreasonable search."  (Doc. 1, ¶¶ 39, 45).  Subsequently, in his Response to the Defendants' Motion for Summary Judgment, he alleged that Hotchkiss secured a search warrant for the Plaintiff's home by "falsely testifying before a Magistrate."  (Doc. 57 at 5).  The Plaintiff appears to arrive at this allegation because Hotchkiss' affidavit stated that Gonzalez "did invite a 16 year old verbally and via text message to sleep overs and swimming parties" even though Hotchkiss had not verified the existence of the text messages.  (Doc. 57-1, ¶ 12).  But this is not deliberate falsity or even reckless disregard for the truth.  This is a statement made based on accusations reported by the Plaintiff's students, and Hotchkiss was provided no reason to believe these accusations false.  Indeed, as the Plaintiff testified at his deposition, the Defendants simply conveyed to the Magistrate information obtained from interviews with the girls.  (Doc. 45 at 102-03).  And as discussed above, this information provided the

arguable probable cause to believe the Plaintiff had committed a crime.  Consequently, the Plaintiff has not provided evidence to support his allegation that Hotchkiss' affidavit "contains 'deliberate falsity or ... reckless disregard' for the truth."  *Madiwale*, 117 F.3d at 1326.

The Plaintiff may well have been the unfortunate victim of either overactive teenage imaginations or even a malicious student plot, and the presence of the media at his arrest is cause for concern.  However, based upon the information within the collective knowledge of the Defendants, there existed at least arguable probable cause to arrest the Plaintiff for the crime of enticing a child for indecent purposes.  Accordingly, qualified immunity applies, and Defendants Overbey, Hotchkiss, and Mundy are entitled to summary judgment on the Plaintiff's § 1983 false arrest, unreasonable search, and malicious prosecution claims.

### ii.   Excessive Force

"[W]here an excessive force claim is predicated solely on allegations that the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim."  *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006).  However, "the damages recoverable on an unlawful arrest claim 'include damages suffered because of the use of force in effecting the arrest.'"  *Id.* (quoting *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995)).

Here, the Plaintiff's excessive force claim is limited to him being handcuffed and the Defendants untimely loosening the handcuffs after he complained they were too

tight.  To the extent the Plaintiff asserts an excessive force claim based upon the Defendants lacking the power to make an arrest, it is subsumed within his unlawful arrest claim, which, as set forth above, fails as a matter of law.

To the extent the Plaintiff purports to raise a discrete excessive force claim for being handcuffed, the Plaintiff has not created a genuine issue of material fact as to the existence of excessive force.  "Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal."  *Rodriguez v. Farrell*, 280 F.3d 1341, 1352, (11th Cir. 2002).  Here, the Plaintiff has presented no evidence of any injury caused by his handcuffing on December 17, 2008.  Thus, the Plaintiff has failed to establish a constitutional violation on a discrete excessive force claim, and the Defendants are entitled to qualified immunity.  Accordingly, summary judgment is appropriate on the Plaintiff's excessive force claim.

### E.    State Law Claims

The Plaintiff's only remaining claims against Defendants Overbey, Hotchkiss, and Mundy are state law claims.  In his complaint, the Plaintiff included claims of malicious prosecution, false arrest, false imprisonment, battery, intentional infliction of emotional distress, and damage to personal property, all pursuant to Georgia state law.  The Defendants contend they are entitled to official immunity from these claims.  Because the Court has granted summary judgment to the Defendants on all federal law claims over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over any state law claims.  28 U.S.C. § 1367(c).  These claims are best resolved by a

Georgia state court.  Accordingly, to the extent the Plaintiff has asserted claims pursuant to Georgia law, those claims are **dismissed without prejudice**.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is **GRANTED**.

**SO ORDERED,** this 24th day of September, 2012.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT